**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **SERVICE EMPLOYEES INTERNATIONAL UNION NATIONAL INDUSTRY PENSION FUND, et al.**, <br><br> Plaintiff, <br><br> v. <br><br> **FOREST HILL HEALTH CARE CENTER, INC.**, <br><br> Defendant. | Case No. 14-cv-01531 (CRC) |

## MEMORANDUM OPINION AND ORDER

Under the Pension Protection Act of 2006, a multiemployer pension benefit fund that falls into "critical" financial status may require participating employers to make supplemental contributions to the fund. See Pub. L. No. 109-280, 120 Stat. 780, 868, 872. Plaintiff, the Service Employees International Union's ("SEIU") National Industry Pension Fund, found itself in such a state in 2009 and asked its participating employers to increase their contributions accordingly. After one employer—Forest Hill Health Care Center in Newark, New Jersey— failed to make its supplemental contributions, the Fund filed suit under ERISA and now moves for summary judgment.

As there is no dispute that the Fund was authorized to impose the compulsory contributions or that Forest Hill has not made all of them, the Court will grant the Fund's motion with respect to liability. There is genuine disagreement, however, over the amount Forest Hill still owes. The Fund claims that the amount should be calculated based on a certain contribution schedule, whereas Forest Hill insists another, less-costly schedule should apply. The resulting difference appears to be only about $26,000, plus interest and liquidated damages—a modest

enough starting point, one would think, for a mutually agreeable negotiated resolution. But be that as it may, Forest Hill has raised a genuine factual question as to whether it opted for its desired schedule. The Court will therefore deny the Fund's summary judgment motion as to damages.

### I.     Background

The former collective bargaining agreement ("CBA") between SEIU and Forest Hill obligated Forest Hill to make monthly contributions to the Plaintiff SEIU Pension Fund based on percentages of each employee's gross earnings. In November 2009, the Fund notified its participating employers that "investment losses in 2008 triggered the Fund entering what [the Pension Protection Act of 2006 ("PPA")] calls 'critical status' (generally referred to as the 'Red Zone')." Pls.' Mot. Summ. J. Ex. 7, at 1. The notice also informed employers that pursuant to the PPA, the Fund was adopting a Rehabilitation Plan in order to recoup those losses. That Plan required "additional employer contributions . . . in order for the [Fund] to exit the Red Zone . . . by the end of 2023." Id. The parties do not dispute the Fund's authority, under the CBA and the PPA, to impose such a Plan or to require additional monthly employer contributions above the standard contributions the CBA required. See Pls.' Mot. Summ. J. 6–9; Def.'s Opp'n Mot. Summ. J. 4–7.

The Plan required those additional contributions to take two forms—a 10% surcharge on the employer's standard monthly contributions, Pls.' Mot. Summ. J. Ex. 8 ("Anderson Decl.") ¶ 21, and supplemental monthly contributions according to one of two schedules—a Preferred Schedule or a Default Schedule, Pls.' Mot. Summ. J. Ex. 7, at 1. Under each schedule, the supplemental contributions would be calculated as a percentage increase on the standard contributions, and would themselves increase each year for the first several years and then level

off.  The Preferred Schedule required lower payments for the first several years than did the Default Schedule.  See id. App. A, at 4–5.  The notice gave employers the option to renegotiate in their next CBAs with SEIU either the Preferred or the Default Schedule and indicated that the Default Schedule would be imposed if the employer did not make a selection (to be reflected in the new agreement) within "180 days of the termination of the last [collective bargaining] agreement," or, if the "collective bargaining agreement ha[d] expired prior to the date of this notice, but not yet renewed, . . . 180 days . . . from the date of this notice."  Id. App. B, at 1.  The parties agree that there was an unexpired collective bargaining agreement in place at the time the notice was issued, and therefore that the employer's selection deadline was 180 days from the termination of that agreement.

The parties also agree that, following the notice, Forest Hill paid into the Fund its standard monthly contributions and the 10% surcharge required under the Rehabilitation Plan, totaling about $123,000.  See Pls.' Reply Ex. 1 ("Suppl. Anderson Decl.") ¶ 9; Def.'s Opp'n 1.  The Fund contends that Forest Hill failed, however, to pay supplemental contributions under either the Preferred or Default Schedules once the prior CBA had expired.[1]  And Forest Hill can point to no evidence in the record that it did.

The dispute, then, boils down to whether the supplemental contributions that Forest Hill still owes to the Fund should be calculated based on the Preferred or the costlier Default Schedule.  According to the Fund, Forest Hill, for the relevant period, would owe $27,456.32 in unpaid supplemental contributions under the Preferred Schedule and $53,790.44 under the

---

[1] The Fund filed suit under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1132(a)(3), (d)(1), (g)(2), and 1145, and the Labor Management Relations Act of 1947, as amended, 29 U.S.C. § 185(a), and now moves for summary judgment.

Default Schedule[2]—for a difference of approximately $26,000.  See Anderson Decl. ¶ 26; id. Ex. A; Suppl. Anderson Decl. ¶ 8.  Forest Hill does not appear to dispute these calculations.  See Def.'s Opp'n Mot. Summ. J. Ex. 3 ("Jasinski Decl.") ¶ 14; id. Ex. 7.  The Fund maintains that Forest Hill did not select the Preferred Schedule, and thus the Fund was entitled to impose, and expect payments under, the Default Schedule.  Forest Hill insists that it selected the Preferred Schedule during its negotiations with SEIU over the new CBA and is therefore responsible only for the lower payments required under that schedule.  To substantiate that assertion, Forest Hill offers a declaration by George Mervine, who represented it in the negotiations with the Union.  See Def.'s Opp'n Mot. Summ. J. Ex. 8 ("Mervine Decl."). Mr. Mervine attests that a series of handwritten notes taken during the course of the negotiations "reflect discussions about the Pension Fund, with Forest Hill specifically selecting the Preferred Schedule."  Mervine Decl. ¶ 6.  Defendant attached copies of the notes to the declaration and proffers their admissibility under the business-records exception to the hearsay rule.  See America v. Mills, 654 F. Supp. 2d 28, 35–36 (D.D.C. 2009) (concluding that the Court could consider thus-far inadmissible evidence on summary judgment where its admissibility could later be established under the business-records exception to the hearsay rule).  The Court held a hearing on the Fund's motion for summary judgment on March 1, 2016.

## II.     Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A dispute is genuine only if a

---

[2] The Fund also contends that Forest Hill would owe interest, liquidated damages, and attorneys' fees and costs.  See Pls.' Mot. Summ. J. 1.

4

reasonable fact-finder could find for the nonmoving party; a fact is material only if it is capable of affecting the outcome of the litigation.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Laningham v. U.S. Dep't of Navy, 813 F.2d 1236, 1241 (D.C. Cir. 1987).  In assessing a party's motion for summary judgment, the court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the . . . motion.'"  Scott v. Harris, 550 U.S. 372, 378 (2007) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam)).

**III.   Analysis**

    A.   Liability

There is no genuine dispute as to any material fact underlying liability.  As discussed above, the parties agree that the Fund-imposed Rehabilitation Plan required both a 10% monthly surcharge and supplemental contributions of varying amounts based on two alternative schedules.  And Forest Hill does not dispute the Fund's authority to require those additional monthly contributions under the CBA and the PPA.  The parties also agree that Forest Hill has paid the required surcharges.  While Forest Hill insisted during the hearing that it had also paid some amount of supplemental contributions, it was unable to point to any evidence in the record supporting that assertion.  Because Forest Hill cannot substantiate this claim, there is no genuine dispute in the record, and the Fund is entitled to judgment on liability as a matter of law.

    Section 515 of ERISA provides that

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145.  This section "makes a federal obligation of an employer's contractual commitment to contribute to a multiemployer pension fund."  Flynn v. R.C. Tile, 353 F.3d 953,

958 (D.C. Cir. 2004).  And where, as here, "it is undisputed that [a defendant employer] was contractually bound" to contribute to a pension benefit fund and "failed to do so," the defendant "is liable [for that failure under] section 515 of ERISA."  Serv. Emps. Int'l Indus. Pension Fund v. Aliquippa Cmty. Hosp., 628 F. Supp. 2d 166, 171–72 (D.D.C. 2009).  Because the parties do not dispute that the CBA obligated Forest Hill to contribute to the Fund and empowered the Fund to require supplemental contributions in the event the Fund entered the Red Zone, and because there is no evidence in the record that Forest Hill made any supplemental contributions, the Court concludes that Plaintiffs are entitled to summary judgment as to liability.

      B.      Damages

This case is really only about damages—specifically, which of the two contribution schedules applies.  As noted above, the November 2009 Rehabilitation Plan notice imposed a 10% surcharge on participating employers beginning January 1, 2010.  See Pls.' Mot. Summ. J. Ex. 7 App. B, at 1.  The surcharge was to remain in place until the employer negotiated a new collective bargaining agreement with the Union.  See id.  At that point, the employer would begin to make supplemental contributions, in lieu of the surcharge, according to either the Preferred Schedule or the Default Schedule.  Id.  Employers were given the choice of which schedule to negotiate into the new collective bargaining agreement.  The notice indicated that if the employer's "bargaining group does not adopt a schedule and provide your agreement to the Fund Office within 180 days of the termination of [your] last agreement, the [Fund] Trustees will impose the Default Schedule[.]"  Id.

The CBA in place at the time of the notice was renegotiated over a series of meetings from August 2011 to August 2013.  See Mervine Decl. ¶¶ 3–11.  When Forest Hill and the Union were not able to reach a new agreement, Forest Hill sent the Union a Last and Final Offer, which

the parties agree functionally replaced the previous CBA.  See id. ¶ 11; see also Pls.' Mot. Summ. J. Ex. 3.  With respect to supplemental contributions, Article 14 of the Last and Final Offer indicates in its entirety, "National Industry Pension Fund[:]  Contribution rates as agreed by the Parties."  Pls.' Mot. Summ. J. Ex. 3, at 3.

The Plan does not maintain that Forest Hill failed to provide its renewal agreement—in the form of the Last and Final Offer—to the Fund office within 180 days after termination of the prior CBA, as required by the Rehabilitation Plan notice.  Its argument, rather, is that "[n]o election [of a supplemental contribution schedule] was contained in the renewal agreement that *was* sent to the Fund."  Pls.' Reply 4 (emphasis added).  And Forest Hill does not contend that it provided any other written notice to the Fund office indicating an election of either schedule.  The question, then, is whether Article 14 of the Last and Final Offer constituted a valid election of the Preferred Schedule by Forest Hill.  The Court concludes that a reasonable jury could find that it did.  Forest Hill has proffered handwritten notes from its negotiation sessions with the Union, along with a declaration from its bargaining representative attesting that the notes reflect an election of the Preferred Schedule.  See Mervine Decl. ¶¶ 4, 6; id. Ex. 1.  While the precise election is not spelled out in the Last and Final Offer, a jury would be entitled to consider extrinsic evidence in deciding whether the "contribution rates as agreed by the Parties" were, in fact, the rates set forth in the Preferred Schedule.  Pls.' Mot. Summ. J. Ex. 3, at 3; see also Holland v. Freeman United Coal Mining Co., 574 F. Supp. 2d 116, 129 (D.D.C. 2008) ("[E]xtrinsic evidence of the meaning of disputed clauses [in collective bargaining agreements] such as past practice, related agreements, and bargaining history are quite properly considered to determine the parties' intentions[.]" (second alteration in original) (quoting United Mine Workers of Am. 1950 Benefit Plan & Trust v. BCOA, 898 F.2d 177, 181 (D.C. Cir. 1980))).

And the negotiation notes—whose potential admissibility the Fund has not convincingly challenged at this stage of the proceedings—raise a genuine question as to whether Forest Hill made that election. The Court will therefore deny the Fund's motion for summary judgment with respect to damages and set this matter for trial. In the meantime, the Court strongly encourages the Parties to return to the proverbial bargaining table and implement whatever rates Forest Hill and the Union agreed to previously. Too little appears at stake to justify the expense of further proceedings in this case.

### IV.  Conclusion

For the foregoing reasons, it is hereby

**ORDERED** that [22] Plaintiffs' Motion for Summary Judgment is **GRANTED** with respect to liability and **DENIED** with respect to damages.

**SO ORDERED**.

CHRISTOPHER R. COOPER
United States District Judge

Date:   March 16, 2016